[Cite as *Atkinson v. Dept. of Rehab. & Corr.*, 2010-Ohio-3145.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ROBERT L. ATKINSON

    Plaintiff

    v.

DEPT. REHABILITATION AND CORRECTION

    Defendant

    Case No. 2009-01379-AD

Deputy Clerk Daniel R. Borchert

MEMORANDUM DECISION


{¶ 1} Plaintiff, Robert L. Atkinson, an inmate under the custody of defendant, Department of Rehabilitation and Correction (DRC), filed this action alleging he suffered personal injury on July 16, 2008 while incarcerated at DRC's Warren Correctional Institution (WCI). Specifically, plaintiff asserted he suffered a fractured nose and lung damage as a result of being "assaulted" by two WCI employees, identified as twin brothers, Officer Paul Adkins and Officer Stephen Adkins. Plaintiff contended he was punched and kicked in the face and his head while he was handcuffed. Plaintiff further contended he was "maced," which exacerbated his pulmonary disease, sarcoidosis. Plaintiff filed this complaint seeking to recover damages in the amount of $2,500.00, maintaining he suffered injuries as a result of Paul Adkins and Stephen Adkins using excessive force upon him.[1] Payment of the filing fee was waived.

---

[1] Plaintiff has also made allegations that defendant's actions toward him constituted violations of the Eighth and Fourteenth Amendments of the United States Constitution.

It is well-settled that claims based upon alleged constitutional violations are not actionable in the Court of Claims. See *Thompson v. Southern State Community College* (June 15, 1989), Franklin App. No. 89AP-114; *Burkey v. Southern Ohio Corr. Facility* (1988), 38 Ohio App. 3d 170, 528 N.E. 2d 607; *Gersper v. Ohio Dept. of Hwy. Safety* (1994), 95 Ohio App. 3d 1, 641 N.E. 2d 113. Any constitutional

{¶ 2} Defendant acknowledged WCI employee, Officer Paul Adkins, used force against plaintiff on July 16, 2008. However, defendant specifically denied the use of force was excessive or that plaintiff suffered the injuries alleged from the use of force. Defendant explained plaintiff was placed on fifteen days of "cell isolation" on July 11, 2008 for a rule violation, "smoking in an unapproved area." The cell isolation status was imposed after plaintiff was issued a "Conduct Report" (copy submitted) charging him with violating institutional rules and a guilty finding was rendered by the WCI Rules Infraction Board (copy of "Hearing Officers Report" submitted). Defendant related, "[c]ell isolation means that except for certain limited exceptions an inmate is restricted to his cell." On July 16, 2008, plaintiff left his cell carrying a crock pot and walked into the WCI dayroom toward the ice machine. Defendant noted Officer Paul Adkins observed plaintiff's actions and "gave plaintiff several orders to return to his cell he was violating his cell isolation." According to defendant, plaintiff instead of complying with the orders to return to his cell, "swung this 'crock pot' by its electrical cord striking Officer P. Adkins in the head." Defendant explained force was then used against plaintiff "to subdue (him), place him in restraints and remove him to the security control." Defendant recorded plaintiff "struggled and fought during this process." Defendant specifically denied the force used to subdue and restrain plaintiff was excessive or that plaintiff received anything but minor injuries at the time.

{¶ 3} Defendant maintained plaintiff was taken to the WCI infirmary for a medical examination "immediately following this incident." A "Medical Exam Report" (copy submitted) filed by WCI nurse, Frances McCloud in connection with the use of force event, confirms that plaintiff was examined within minutes after being subdued and restrained. Upon examination, McCloud observed plaintiff had two swollen lumps on his right forehead and scratches on his cheek and the bridge of his nose. McCloud reported plaintiff complained of headache, dizziness, and chest burning. Plaintiff's vital signs were recorded as follows: blood pressure: 132/85, heart rate: 96, respiration: 18, and temperature: 97.3 . McCloud found plaintiff's lungs sounded clear and his heart sounds were within the normal limits. McCloud also found by examining plaintiff's pupils that he did not manifest any signs of serious head trauma. Under the caption "Nurses

violation claim or claim of federal civil rights violation is not cognizable. See *Howard v. Supreme Court of Ohio*, Franklin App. No. 04AP-1093, 2005-Ohio-2130; *Wright v. Dept. of Rehab. & Corr.* (Mar. 28, 1995),

Assessment" McCloud noted plaintiff had an "alteration in comfort (related to) trauma." According to information provided in the "Medical Exam Report" plaintiff refused any treatment at the time and was then released to segregation. WCI Nurse Frances McCloud also examined and assessed Officer Paul Adkins on July 16, 2008 compiling a "Medical Exam Report" (copy submitted) in the process. McCloud noted Officer Paul Adkins had lacerations on the left side of his face and the back of his neck, as well as scratches on his back, right arm, and right knee. Additionally, McCloud noted an "open area" was observed on Officer Adkins' lip. Adkins' vital signs were recorded as follows: blood pressure: 133/82, heart rate: 114, respiration: 18, temperature: 97.2 . McCloud wrote she treated Adkins by applying cleansing agents and topical antibiotic ointment to the affected areas. Under the caption, "Nurse's Assessment," McCloud recorded Adkins had "[a]lteration in (his) skin integrity (right trauma) lacerations (and) scratches." According to information provided in the "Medical Exam Report," Adkins returned to work and was referred to his personal physician.

{¶ 4} As part of the investigatory process of the July 16, 2008 incident involving plaintiff, Officer Paul Adkins filed an "Incident Report" (copy submitted) containing his own handwritten narrative description. Adkins recalled he observed plaintiff on July 16, 2008 at approximately 3:05 p.m. out of his cell in the WCI dayroom walking toward the ice machine carrying a cup and a crock pot. Adkins further recalled he gave plaintiff four direct orders to return to his cell. According to Adkins, plaintiff "then turned around started to slow walk away." Adkins related he "noticed Inmate Atkinson started wrapping the cord (of the crock pot) around his hand." Adkins noted he responded to plaintiff's action by reaching for his mace to spray plaintiff. Adkins recorded he was struck "in the head several times with the crock pot" manipulated by plaintiff, before "my partner (officer) Simmons and I took Inmate Atkinson to the ground [a]ttempting to place restraints on Inmate Atkinson." Adkins asserted plaintiff resisted being restrained with the two wrestling around the dayroom floor and plaintiff continued to resist even after his right hand was placed in restraint by both Adkins and Officer Simmons. Adkins observed plaintiff continued to resist as additional WCI staff arrived on the scene to place plaintiff in restraints  Adkins advised that due to plaintiff's persistence in resisting he was initially escorted to a segregation unit before being escorted to the infirmary by

two WCI employees.

**{¶ 5}** Pursuant to internal policy the matter involving plaintiff was referred to defendant's "Use of Force Committee," an investigation was conducted, and a "Use of Force Committee Report" (copy submitted) was filed finding the use of force against plaintiff "was justified and was not inappropriate or excessive." No disciplinary action was initiated against the WCI staff members involved, Officers Paul Adkins, Stephen Adkins, Kevin Simmons, Roman Mulligan, Tom Lamb, and Matthew Croswell. All officers were interviewed and presented signed statements. Plaintiff initially refused to make a statement, but subsequently on August 5, 2008, he did provide a handwritten statement (copy submitted) of his recollection of the events of July 16, 2008. The "Use of Force Committee" (Committee) essentially adopted in their findings and conclusions the version of events as stated by Officer Paul Adkins in the July 16, 2008 "Incident Report." The Committee found:

**{¶ 6}** 1) On July 16, 2008 at approximately 3:00 p.m. plaintiff, who was on cell isolation at the time, was observed in the WCI dayroom carrying a crock pot and cup walking toward the ice machine;

**{¶ 7}** 2) Officer Paul Adkins, upon observing plaintiff out of his cell, issued four direct orders to plaintiff to return to his cell, before any indication of compliance with the orders was made;

**{¶ 8}** 3) As plaintiff slowly walked away Officer Paul Adkins noticed him wrapping the cord of the crock pot around his hand. In response to this action, Adkins began to reach for his spray; whereupon plaintiff struck Adkins in the head several times with the crock pot;

**{¶ 9}** 4) Officer Kevin Simmons, who was assigned to the area, responded to the situation, and assisted Officer Adkins in wrestling plaintiff to the dayroom floor, where plaintiff landed on top of Officer Adkins. As plaintiff continued to resist and struggle with Officer Adkins additional WCI staff arrived at the scene and plaintiff was cuffed. Plaintiff was then escorted to the WCI infirmary for a medical examination and then removed to segregation "without further incident."

**{¶ 10}** The "Inmate Use of Force Statement" plaintiff wrote offers a differing version of the July 16, 2008 occurrence. Plaintiff's handwritten statement offering his description of the incident is reproduced in its entirety. Plaintiff wrote: "On Mental

Health caseload, placed on cell isolation. Came out to get ice in order to cool down due to the medication I was taking. I asked Officer (Paul Adkins) if I could get some ice, he told me to get to my cell. I walked toward my cell and turned around to look at the officer. He said if I looked at him again, he would mace me. As I walked to my cell, I looked around and at that time Officer Adkins maced me. I was punched and kicked by officer Adkins. Many inmates gathered around Officer Adkins brother (Officer Stephen Adkins) came in and also hit me. Lt. Williams arrived and ordered the officers to take me to medical."

{¶ 11} Defendant contended plaintiff failed to produce sufficient evidence to prove the force use against him was unjustified or unnecessary. Defendant asserted force against plaintiff was used only as a means to subdue him after he had assaulted a WCI employee. Defendant related that under the circumstances presented and in compliance with internal regulations the force used against plaintiff was appropriate. Defendant explained "correction officers are authorized to use force pursuant to AR 5120-9-01" with six circumstances listed for situations where use of force is appropriate:

{¶ 12} "(2) Less-than-deadly force. There are six general circumstances in which a staff member may use force against an inmate or third person. A staff member may use less-than-deadly force against an inmate in the following circumstances:

{¶ 13} "(a) Self-defense from physical attack or threat of physical harm.

{¶ 14} "(b) Defense of another from physical attack or threat of physical attack.

{¶ 15} "(c) When necessary to control or subdue an inmate who refuses to obey prison rules, regulations or orders.

{¶ 16} "(d) When necessary to stop an inmate from destroying property or engaging in a riot or other disturbance.

{¶ 17} "(e) Prevention of an escape or apprehension of an escapee; or

{¶ 18} "(f) Controlling or subduing an inmate in order to stop or prevent self-inflicted harm."

{¶ 19} Defendant maintained plaintiff's claim "has no merit" since he has failed to prove the force used against him was inappropriate or excessive. Defendant argued plaintiff's claim should be denied.

{¶ 20} Plaintiff filed a voluminous response insisting he suffered a "fractured nose" and aggravation of his sarcoidosis "lung disease" as a result of being struck and

maced by Officer Paul Adkins on July 16, 2008. Plaintiff also reasserted he was assaulted by Officer Stephen Adkins. Furthermore, plaintiff claimed that subsequent to the July 16, 2008 incident he was treated with deliberate indifference[2] by defendant's medical staff in regard to his disease condition, sarcoidosis and retaining Paul Adkins as a corrections officer despite past displays of improper conduct. Plaintiff did not offer sufficient evidence other than his own assertions to prove he actually suffered a fractured nose and/or exacerbation of his sarcoidosis disease condition as a result of the July 16, 2008 use of force incident. Plaintiff did submit a copy of a document generated by defendant's Corrections Medical Center that appears to be a medical assessment of x-rays of plaintiff's nasal bones taken on August 5, 2008. The document, signed by Charles H. Muncrief, D.O. contains the notation: "[t]here is minimal bony fragmentation about the tip of the nasal spine that could be related to non-displaced fracture."

{¶ 21} Additionally, plaintiff submitted documentation that Officer Paul Adkins had been investigated for an act committed at the Ross Correctional Institution (RCI) on January 28, 2007, disciplined for an act committed on October 10, 2007, and subsequently terminated from his position as a Correctional Officer based on remarks he made toward plaintiff on July 16, 2008, immediately following the use of force incident. In regard to the January 28, 2007 event, after conducting an investigation, the investigating officer concluded, Adkins had probably thrown a state chair over the top range of the RCI H-3B Housing Unit. The falling chair almost struck an inmate. Adkins was "fined 2 days pay" by WCI supervisors for exercising poor judgment on October 10, 2007 in his capacity as a Correctional Officer by wrestling with an inmate on the stairwell/fire escape located in the 2C Housing Unit at WCI. Finally, Adkins was terminated from his employment, effective October 1, 2008, for a racial slur he directed at plaintiff on July 16, 2008, as he left the WCI 3D Housing Unit. According to the notice of termination sent to Adkins, "[t]here were several staff members and inmates in the area" at the time the racial slur comment was made. Adkins was informed his removal

---

[2] As plaintiff pointed out claims of "deliberate indifference" are characterized as violations of constitutional rights grounded in rights under Section 1983, Title 42 U.S. Code. Any allegations or claims couched as violations of plaintiff's constitutional rights are dismissed. This court lacks jurisdiction to hear a claim to the extent it asserts constitutional violations. *Gersper*. Constitutional claims and claims based on Section 1983, Title 42, U.S. Code are not actionable in this court. *Bleicher v. Univ. of Cincinnati*

was based on the following infraction(s): "threatening, intimidating, coercing, or use of abusive language toward any individual under the supervision of the Department."

{¶ 22} Plaintiff reasserted he was assaulted by Officer Paul Adkins on July 16, 2008 and seemingly denied he hit Adkins with a crock pot. Plaintiff acknowledged he was criminally charged with assault, but characterized the charge as a "false (accusation)."[3] Plaintiff maintained that "defendant had been aware of Officer Paul Adkins' violent behaviors against namely African American-Black inmates" at various institution. Essentially, plaintiff has argued defendant negligently retained Adkins as a Correctional Officer despite knowledge of his "reckless" past behaviors. Plaintiff again contended excessive force was used against him on July 16, 2008 by Paul Adkins. Additionally, plaintiff claimed the conduct of Paul Adkins constituted the intentional infliction of emotional distress. Plaintiff expressed the opinion that "his fractured nose and violent illness (lung disease), after being sprayed with mace, associated with his claimed excessive use of force, constitute sufficient injury to support an award of damages for emotional trauma, added with being criminally prosecuted." Also, plaintiff related that Adkins' racial slur remark has caused plaintiff "to fear for his safety."

{¶ 23} To prevail on a claim of intentional infliction of emotional distress, plaintiff must show that: "(1) defendant intended to cause emotional distress, or knew or should have known that actions taken would result in serious emotional distress; (2) defendant's conduct was extreme and outrageous; (3) defendant's actions proximately caused plaintiff's psychic injury; and (4) the mental anguish plaintiff suffered was serious." *Hanly v. Riverside Methodist Hosp.* (1991), 78 Ohio App. 3d 73, 82, 603 N.E. 2d 1126; citing *Pyle v. Pyle* (1983), 11 Ohio App. 3d 31, 34, 11 OBR 63, 463 N.E. 2d 98.

{¶ 24} Furthermore, plaintiff failed to establish that defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20, Teamsters* (1983), 6 Ohio St. 3d 369, 375, 6 OBR 421, 453 N.E. 2d 666, quoting Restatement of the Law 2d, Torts (1965), 73,

---

*College of Med.* (1992), 78 Ohio App. 3d 302, 604 N.E. 2d 783.

[3] Plaintiff was convicted of a violation of R.C. 2903.13(A) (assault) on September 29, 2009 after a jury trial in the Warren County Court of Common Pleas. On October 1, 2009 the conviction was appealed.

Section 45, Comment d. "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. * * * Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Yeager* at 374-375.

{¶ 25} In the instant claim, plaintiff has failed to offer sufficient proof to show the conduct of defendant's employee on July 16, 2008 amounted to the standard to prove the intentional infliction of emotional distress. Furthermore, plaintiff has not proven the acts of defendant subsequent to the July 16, 2008 incident rose to the level of being extreme in degree or outrageous in character.

{¶ 26} In order for plaintiff to prevail on his negligent training and supervision claim, he must prove: (1) the existence of an employment relationship, (2) incompetence of the employee, (3) the employer's actual or constructive knowledge of the employee's incompetence, (4) an act or omission by the employee that caused damage to the plaintiff, and (5) negligent retention of the employee by the employer that proximately caused the plaintiff's injuries. *Payton v. Receivables Outsourcing, Inc.*, 163 Ohio App. 3d 722, 2005-Ohio-4978. Based on the elements cited, the court finds any injuries plaintiff received during the July 16, 2009 incident were not proximately caused by defendant retaining Officer Paul Adkins. From the evidence presented, the trier of fact finds the use of force against plaintiff was justified and not excessive, and the remarks made by Adkins did not rise to the level of actionable intentional infliction of emotional distress.

{¶ 27} In the instant claim, plaintiff has asserted WCI employee, Officer Paul Adkins, intentionally committed a wrongful act against him. To determine if defendant should bear responsibility for an employee's wrongful act, a finding must be made, based on the facts presented, whether or not the injury causing act was manifestly outside the course and scope of employment. *Elliott v. Ohio Dept. of Rehab. & Corr.* (1994), 92 Ohio App. 3d 772, 775, 637 N.E. 2d 106; *Thomas v. Ohio Dept. of Rehab. & Corr.* (1988), 48 Ohio App. 3d 86, 89, 548 N.E. 2d 991; and *Peppers v. Ohio Dept. of*

*Rehab. & Corr.* (1988), 50 Ohio App. 3d 87, 90, 553 N.E. 2d 1093. It is only where the acts of state employees are motivated by actual malice or other such reasons giving rise to punitive damages that their conduct may be outside the scope of their employment. *James H. v. Dept. of Mental Health and Mental Retardation* (1980), 1 Ohio App. 3d 60, 61, 1 OBR 6, 439 N.E. 2d 437. The act must be so divergent that it severs the employer-employee relationship. *Elliott*, at 775 citing *Thomas*, at 89, and *Peppers*, at 90.

{¶ 28} Malicious purpose encompasses exercising "malice," which can be defined as the willful and intentional design to do injury, or the intention to desire to harm another, usually seriously, through conduct that is unlawful or unjustified. *Jackson v. Butler Cty. Bd. of Cty. Commrs.* (1991), 76 Ohio App. 3d 448, 453-454, 602 N.E. 2d 363, citing *Teramano v. Teramano* (1966), 6 Ohio St. 2d 117, 118, 35 O.O. 2d 144, 216 N.E. 2d 375; and *Bush v. Kelly's Inc.* (1969), 18 Ohio St. 2d 89, 47 O.O. 2d 238, 247 N.E. 2d 745.

{¶ 29} The Supreme Court of Ohio has established that an employer is liable for the tortious conduct of its employee only if the conduct is committed within the scope of employment and if the tort is intentional, the conduct giving rise to the tort must facilitate or promote the business of which the employee was engaged. *Byrd v. Faber* (1991), 57 Ohio St. 3d 56, 565 N.E. 2d 584, citing *Little Miami RR. Co. v. Wetmore* (1869), 19 Ohio St. 110, and *Taylor v. Doctors Hosp.* (1985), 21 Ohio App. 3d 154, 21 OBR 165, 486 N.E. 2d 249.

{¶ 30} Further, an intentional and willful tort committed by an employee for his own purposes constitutes a departure from the employment, so that the employer is not responsible, *Szydlowski v. Ohio Dept. of Rehab. & Corr.* (1992), 79 Ohio App. 3d 303, 607 N.E. 2d 103, citing *Vrabel v. Acri* (1952), 156 Ohio St. 467, 46 O.O. 387, 103 N.E. 2d 564. The facts of this case, taken in the context of the situation as plaintiff presented, would constitute an intentional tort committed by defendant's employee performed for his own personal purpose. Following this rationale, plaintiff cannot maintain a cause of action against defendant for the intentional malicious act of its employee.

{¶ 31} In regard to the use of force issue, the court concludes plaintiff has failed to prove the force used against him on July 16, 2008 was either excessive or unjustified

under the facts presented. The Ohio Administrative Code sets forth circumstances under which force may be lawfully utilized by prison officials and employees in controlling inmates. Ohio Adm. Code 5120-9-01(C) provides in relevant part:

{¶ 32} "(2) Less-than-deadly force. There are six general circumstances in which a staff member may use force against an inmate or third person. A staff member may use less-than-deadly force against an inmate in the following circumstances:

{¶ 33} "(a) Self-defense from physical attack or threat of physical harm.

{¶ 34} "(b) Defense of another from physical attack or threat of physical attack.

{¶ 35} "(c) When necessary to control or subdue an inmate who refuses to obey prison rules, regulations or orders.

{¶ 36} "(d) When necessary to stop an inmate from destroying property or engaging in a riot or other disturbance.

{¶ 37} "(e) Prevention of an escape or apprehension of an escapee; or

{¶ 38} "(f) Controlling or subduing an inmate in order to stop or prevent self-inflicted harm."

{¶ 39} The court has recognized that "corrections officers have a privilege to use force upon inmates under certain conditions. * * * However, such force must be used in the performance of official duties and cannot exceed the amount of force which is reasonably necessary under the circumstances. * * * Obviously 'the use of force is a reality of prison life' and the precise degree of force required to respond to a given situation requires an exercise of discretion by the corrections officer." *Mason v. Ohio Dept. of Rehab. & Corr.* (1990), 62 Ohio Misc. 2d 96, 101-102, 593 N.E. 2d 482. (Internal citations omitted.)

{¶ 40} The degree of an injury might, in some cases, be an indicator of the amount of force used or be useful in resolving a factual dispute, and thereby be relevant to determining the excessiveness issue. See, e.g., *Watley v. Ohio Dept. of Rehab. & Corr.*, Ct. of Cl. No. 2004-09061, 2006-Ohio-1109. Evidence in the instant action shows plaintiff may have suffered a nondisplaced nasal fracture from being taken to the dayroom floor by Officers Adkins and Simmons. Conversely, plaintiff asserted he was struck in the face by Officer Paul Adkins and Officer Stephen Adkins. Based on the evidence presented, the court finds the force used by any WCI personnel on July 16, 2008 was justified under Ohio Adm. Code 5120-9-01(C)(1) and (3). Plaintiff maintained

he was assaulted. The credibility of witnesses is an issue primarily for the trier of fact. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St. 3d 77, 10 OBR 408, 461 N.E. 2d 1273. The trier of fact is free to believe all, part, or none of the statements of any witnesses. See, *State v. Long* (1998), 127 Ohio App. 3d 328, 335, 713 N.E. 2d 1. The trier of fact does not find the statements of plaintiff in regard to the events of July 16, 2008 to be particularly persuasive. The evidence points to the fact plaintiff assaulted Officer Adkins and in turn had justified force used against him.

{¶ 41} Plaintiff explained that at the time of the July 16, 2008 incident he was "on [d]efendant's Mental Health Case load" and was receiving medication "for the treatment of his (severe) mental disorder, such as schizophrenia, schizoaffective disorder, and bipolar disorders." Plaintiff pointed out that due to his "Mental Health Case load" status defendant pursuant to internal policy was required to provide him with a treatment plan outlining a course of treatment. According to plaintiff, he was not provided any treatment plan, but instead after the events of July 16, 2008 "only received disciplinary infractions as punishment and no intervention from (defendant's) Medical or Mental Health Services." Furthermore, plaintiff asserted defendant violated its own guidelines by transferring him from WCI to the Lebanon Correctional Institution (LeCI) and later to the Southern Ohio Correctional Facility (SOCF), a maximum security institution. Plaintiff also claimed he was wrongfully confined in a segregation unit at WCI before being sent to LeCI. Plaintiff related he "was subjected to additional physical injury (transfer) to LeCI and SOCF, a 'maximum' security prison in segregation for over 1 year." Plaintiff asserted that his transfers to both LeCI and SOCF were the result of a "false" conduct report issued against him for "reportedly assaulted Officer Paul Adkins, in the head with a plastic crock pot." Plaintiff further asserted "[d]efendant in this matter made a high mistake by sending plaintiff to a Maximum Security prison from the beginning on or after July 16, 2008."

{¶ 42} The Supreme Court of Ohio has held that "[t]he language in R.C. 2743.02 that 'the state' shall 'have its liability determined *** in accordance with the same rules of law applicable to suits between private parties ***' means that the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Reynolds v. State* (1984),

14 Ohio St. 3d 68, 70, 14 OBR 506, 471 N.E. 2d 776; see also *Von Hoene v. State* (1985), 20 Ohio App. 3d 363, 364, 20 OBR 467, 486 N.E. 2d 868. Prison administrators are provided "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institution security." *Bell v. Wolfish* (1979), 441 U.S. 520, 547, 99 S. Ct. 1861, 60 L. Ed. 2d 447.

{¶ 43} Prison regulations, including those contained in the Ohio Administrative Code, "are primarily designed to guide correctional officials in prison administration rather than to confer rights on inmates." *Steve ex rel. Larkins v. Wilkinson*, 79 Ohio St. 3d 477, 479, 1997-Ohio-139, 683 N.E. 2d 1139, citing *Sandin v. Conner* (1995), 515 U.S. 472, 481-482, 115 S. Ct. 2293, 132 L. Ed. 2d 418. Additionally, this court has held that "even if defendant had violated the Ohio Administrative code, no cause of action would exist in this court. A breach of internal regulations in itself does not constitute negligence. *Williams v. Ohio Dept. of Rehab. and Corr.* (1993), 67 Ohio Misc. 2d 1, 3, 643 N.E. 2d 1182. Accordingly, to the extent that plaintiff alleges that defendant somehow violated internal prison regulations and the Ohio Administrative Code, by not providing a treatment plan or by transferring him to other institutions, or by assigning him to a segregation unit, he fails to state a claim for relief. Furthermore, any claims by plaintiff involving segregation assignments or institutional transfers are essentially claims based upon the conditions of his confinement. Inmate complaints regarding the conditions of confinement are treated as claims arising under 42 U.S.C. 1983. *State ex rel. Carter v. Schotten*, 70 Ohio St. 3d 89, 91, 1994-Ohio-37, 637 N.E. 2d 306. Such claims may not be brought against the state in the Court of Claims because the state is not a "person" within the meaning of Section 1983.

{¶ 44} In his response, plaintiff contended defendant's medical personnel were negligent in delaying treatment for his sarcoidosis condition, which he claimed was aggravated by being maced on July 16, 2008. Plaintiff did not submit any medical evidence to prove sarcoidal inflammation may be exacerbated from skin contact with mace. Plaintiff recalled he became "violently ill" immediately after the July 16, 2008 incident and continued to experience illness after being transferred from WCI to a segregation unit at LeCI. Plaintiff further recalled that despite "being violently ill" he was not permitted to see defendant's "Chief Medical doctor" Dr. J. McWeeney, "for over 43

days." Plaintiff asserted he was not permitted to receive medical attention for complaints associated with his sarcoidosis until August 26, 2008 when he was examined and treated by Dr. James M. O'Brien, a physician at the Pulmonary Telemedicine Clinic at The Ohio State University Medical Center. Plaintiff filed a grievance (copy submitted) on August 20, 2008 noting he was permitted to see a physician at LeCI, Dr. Huerta, on August 19, 2008 after he complained of coughing up blood and experiencing chest pain. Plaintiff submitted copies of medical records from The Ohio State University Medical Center and letters from Dr. James O'Brien summarizing his medical condition.

{¶ 45} Based on the allegations in plaintiff's response, the court finds plaintiff asserted a "medical claim" as that term is defined in R.C. 2305.113(E).

{¶ 46} Civ.R. 10(D)(2) provides in pertinent part:

{¶ 47} "(a) * * * [A] complaint that contains a medical claim, dental claim, optometric claim, or chiropractic claim, as defined in section 2305.113 of the Revised Code, shall include one or more affidavits of merit relative to each defendant named in the complaint for whom expert testimony is necessary to establish liability. Affidavits of merit shall be provided by an expert witness pursuant to Rules 601(D) and 702 of the Ohio Rules of Evidence."

{¶ 48} Plaintiff did not file an affidavit of merit with his complaint. The Supreme Court of Ohio has held that where plaintiff fails to file the affidavit required by Civ.R. 10(D)(2), the complaint fails to state a claim for relief. *Fletcher v. Univ. Hosp. of Cleveland*, 120 Ohio St. 3d 167, 2008-Ohio-5379. Consequently, any medical claim plaintiff asserted is dismissed.

{¶ 49} Assuming plaintiff has stated a proper claim for relief based on medical negligence, plaintiff has failed to meet his burden of proof. In order to prevail on a claim of medical malpractice or professional negligence, plaintiff must first prove: 1) the standard of care recognized by the medical community; 2) the failure of defendant to meet the requisite standard of care; and, 3) a direct causal-connection between the medically negligent act and the injury sustained. *Bruni v. Tatsumi* (1976), 46 Ohio St. 2d 127, 75 O.O. 2d 184, 346 N.E. 2d 673. The appropriate standard of care must be proven by expert testimony. *Bruni* at 130. That expert testimony must explain what a medical professional of ordinary skill, care, and diligence in the same medical specialty

would do in similar circumstances. *Bruni*.

{¶ 50} In *Buerger v. Ohio Dept. of Rehab. & Corr.* (1989), 64 Ohio App. 3d 394, 581 N.E. 2d 1114, the Tenth District Court of Appeals found the *Bruni v. Tatsumi* standard applicable to a claim of medical malpractice brought by a prisoner. When a plaintiff is alleging substandard medical treatment, expert medical opinion must be provided to establish a prima facie case. Plaintiff may not simply rest upon allegations of medical negligence as stated in his complaint. *Saunders v. Cardiology Consultants, Inc.* (1990), 66 Ohio App. 3d 418, 420, 584 N.E. 2d 809; *Hoffman v. Davidson* (1987), 31 Ohio St. 3d 60, 61, 31 OBR 165, 508 N.E. 2d 958; *Guth v. Huron Road Hospital* (1987), 43 Ohio App. 3d 83, 84, 539 N.E. 2d 670. In the present claim, plaintiff has failed to produce expert medical opinion regarding causation of aggravated medical conditions and therefore, his claim is denied.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ROBERT L. ATKINSON

   Plaintiff

   v.

DEPT. REHABILITATION AND CORRECTION

   Defendant

   Case No. 2009-01379-AD

Deputy Clerk Daniel R. Borchert

ENTRY OF ADMINISTRATIVE DETERMINATION

Having considered all the evidence in the claim file and, for the reasons set forth

in the memorandum decision filed concurrently herewith, judgment is rendered in favor of defendant.  Court costs are assessed against plaintiff.

_____
DANIEL R. BORCHERT
Deputy Clerk

Entry cc:

Robert L. Atkinson, #545-578
P.O. Box 45699
Lucasville, Ohio  45699

Gregory C. Trout, Chief Counsel
Department of Rehabilitation
and Correction
770 West Broad Street
Columbus, Ohio  43223

RDK/laa
Filed 3/12/10
Sent to S.C. reporter 7/1/10